# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Paul Laidig, Peter Lewis, Michael Robbins, and Derek Kemp, as representatives of a class of similarly situated persons, and on behalf of the Vi-Jon Employee Stock Ownership Plan,<br><br>               Plaintiffs,<br><br>v.<br><br>GreatBanc Trust Company,  Berkshire Fund VI, Limited Partnership, John G. Brunner, John G. Brunner Revocable Trust dated 06-09-1992, and John and Jane Does 1-20,<br><br>               Defendants. | Case No. 1:22-cv-1296<br><br>**AMENDED COMPLAINT**<br><br>**CLASS ACTION** |

## NATURE OF THE ACTION

1.      Plaintiffs Paul Laidig, Peter Lewis, Michael Robbins, and Derek Kemp ("Plaintiffs"), as representatives of the Class described herein, and on behalf of the Vi-Jon Employee Stock Ownership Plan (the "Plan" or the "ESOP"), bring this action under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA"), against Defendants GreatBanc Trust Company ("GreatBanc"), Berkshire Fund VI, Limited Partnership ("Berkshire"), John G. Brunner ("Brunner"), the John G. Brunner Revocable Trust dated 06-09-1992 (the "Brunner Trust" and, together with Brunner, the "Brunner Defendants"), and John and Jane Does 1-20 (collectively "Defendants").

2.      As described herein, Defendants orchestrated a prohibited transaction with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants. Having acquired a controlling interest in Vi-Jon in 2006, Berkshire, a private-equity investor that typically

purchases and sells businesses with relatively frequent turnover, found itself unable to unload its stake in the company after holding it for well over a decade. After failing for years to sell Vi-Jon at the inflated asking price of $400 million, Berkshire and the Brunner Defendants capitalized on the temporary surge in the sale of hand sanitizer (which Vi-Jon manufactures) during the early months of the COVID-19 pandemic to try again. But this time, rather than courting sophisticated buyers on the open market—who would negotiate at arms-length and understand that the pandemic-related boost in hand-sanitizer sales was likely temporary and not a realistic predictor of long-term performance—Berkshire and the Brunner Defendants unloaded their interest onto the ESOP. This allowed Brunner and agents of Berkshire, in their capacity as Vi-Jon directors, to hand-select their counterparty in the transaction: GreatBanc. And GreatBanc played along and approved Brunner and Berkshire's above-market asking price on behalf of the Plan. In order to artificially support the $400 million price, Defendants relied on overly optimistic financial projections based on temporary market conditions that had already started to expire before the deal closed. Business has only continued to slow down since, leaving the company short of Defendants' targets while stuck paying 49-years of installments on Defendants' carelessly negotiated price.

3. Such transactions violate ERISA. *See Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 675 (7th Cir. 2016) (absent "adequate consideration," the "purchase of employer stock by the Plan … [is] indisputably prohibited"). GreatBanc is liable as the fiduciary that "caused the ESOP to … overpay[] … for the stock," see *Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763, 772 (4th Cir. 2019), and Berkshire and the Brunner Defendants are liable as "gratuitous transferee[s]" of excess proceeds of the unfair deal. *See Fish v. GreatBanc Tr. Co.*, 109 F. Supp. 3d 1037, 1043 (N.D. Ill. 2015). Plaintiffs bring this action to remedy this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief as provided by ERISA.

## JURISDICTION AND VENUE

4.      Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

5.      This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

6.      Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) because Defendant GreatBanc may be found in this district and underlying ERISA violations occurred in this district.

## RELEVANT PARTIES

### THE COMPANY

7.      Vi-Jon is a private-label manufacturer of personal care products, including hand sanitizer. Vi-Jon's legacy companies are more than 100 years old.

8.      In 2006, Berkshire acquired a controlling interest in Vi-Jon from Brunner and merged it with a competitor under the Vi-Jon name. Brunner retained a minority interest in the company through the Brunner Trust.

9.      In August 20, 2020, in a series of related transactions (the "ESOP Transaction"), Berkshire and the Brunner Defendants sold Vi-Jon and the ESOP acquired it, making Vi-Jon a 100% employee-owned company.[1] The ESOP's participants are Vi-Jon's employees.

---

[1] During the time between the ESOP effective date and the ESOP Transaction, Vi-Jon was organized as a Tennessee corporation, Vi-Jon Inc. Berkshire and the Brunner Defendants owned Vi-Jon Inc. through a Delaware holding company, VJCS Holdings Inc. In connection with the ESOP Transaction, the Vi-Jon operating entity was reestablished as a new Delaware limited liability company, Vi-Jon LLC, and the Plan's equity interest was issued through a new Delaware holding company, Vi-Jon Holding Inc. References to "Vi-Jon" throughout this complaint relate to the relevant entity or entities, as context requires.

10.     Vi-Jon is the "employer" of the Plan within the meaning of 29 U.S.C. § 1002(5), and the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B). According to the Plan's annual report filed with the Department of Labor in 2021, Vi-Jon is also the "administrator" of the Plan within the meaning of 29 U.S.C. § 1002(16)(A). In these capacities, Vi-Jon is a "party in interest" to the Plan within the meaning of 29 U.S.C. § 1002(14)(A) & (C).

## THE PLAN

11.     The Plan was established by Vi-Jon with an effective date of January 1, 2020.

12.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and an "employee stock ownership plan" within the meaning of 29 U.S.C. § 1007(d)(6).

13.     The Plan was designed to invest primarily in "qualifying employer securities," as defined in 29 U.S.C. § 1107(d)(7).

14.     Through the ESOP Transaction, the Plan acquired 1,203,711 shares of Vi-Jon stock, representing 100% of the issued shares, for $398,512,583. The Plan did not possess any capital prior to the ESOP Transaction and had to borrow 100% of the purchase price. Through refinancing contemplated as part of the ESOP Transaction, the Plan became indebted to the company for the outstanding principal and interest, to be paid over 49 years. Shares of stock are released to participant accounts from an undivided ESOP account in proportion to the amount of the total debt paid each year. The ESOP Transaction closed on or around August 20, 2020.

15.     As of December 31, 2020, the Plan had 1,031 participants with shares allocated to their individual accounts. Pursuant to the terms of the Plan and ERISA, participants are eligible to receive a retirement benefit based on the value of the shares allocated to their individual accounts at retirement.

4

**PLAINTIFFS**

16. Plaintiff Paul "David" Laidig resides in Rockvale, Tennessee. Plaintiff Laidig has worked for Vi-Jon or its predecessor companies for 35 years. Plaintiff Laidig holds company shares allocated to his individual account in the Plan and is a vested participant in the ESOP as defined by 29 U.S.C. § 1002(7).

17. Plaintiff Peter Lewis resides in Smyrna, Tennessee. Plaintiff Lewis has worked for Vi-Jon or its predecessor companies for 27 years. Plaintiff Lewis holds company shares allocated to his individual account in the Plan and is a vested participant in the ESOP as defined by 29 U.S.C. § 1002(7).

18. Plaintiff Michael Robbins resides in Bell Buckle, Tennessee. Plaintiff Robbins worked for Vi-Jon between 2018 and 2021. Plaintiff Robbins holds company shares allocated to his individual account in the Plan and is a vested participant in the ESOP as defined by 29 U.S.C. § 1002(7).

19. Plaintiff Derek Kemp resides in Cahokia, Illinois. Plaintiff Kemp worked for Vi-Jon for 21 years as a chemical operator. Plaintiff Kemp holds company shares allocated to his individual account in the Plan and is a vested participant in the ESOP as defined by 29 U.S.C. § 1002(7).

**DEFENDANTS**

**BERKSHIRE**

20. Berkshire is a Massachusetts limited partnership. Berkshire is controlled by its general partner, Sixth Berkshire Associates LLC ("Berkshire GP"), a Massachusetts limited liability company.

21.     Berkshire and Berkshire GP are affiliated with Berkshire Partners LLC ("Berkshire Firm"), a private equity investment firm based in Boston. The individual managers and members of Berkshire GP are managers and members of Berkshire Firm. Through Berkshire, Berkshire GP, and similar vehicles, Berkshire Firm members use their own capital and capital raised from other institutional investors (i.e., limited partners) to acquire privately held companies for investment purposes. Berkshire Firm investment vehicles typically hold a stake in a company for 3-7 years before selling that stake and distributing proceeds to members and other investors.[2]

22.      In 2006, Berkshire acquired a majority stake in Vi-Jon's predecessors, Missouri's Vi-Jon Laboratories Inc. and Tennessee's Cumberland Swan Holdings Inc., and merged them under the Vi-Jon name. Berkshire also elected Vi-Jon's Board of Directors, including three directors employed by Berkshire Firm, at least one of which was also a member of Berkshire GP.

23.     Fourteen years later, in 2020, Berkshire still held its Vi-Jon stake and Board seats. Through the ESOP Transaction, Berkshire unloaded its stake. Upon information and belief, through financing and refinancing agreements made part of the ESOP Transaction, Berkshire received cash and/or notes for its interest in Vi-Jon.

24.     In connection with the ESOP Transaction, Berkshire was a "party in interest" to the Plan within the meaning of 29 U.S.C. § 1002(14)(H) because Berkshire held, directly or indirectly, 10% or more of the Plan employer's stock.

**BRUNNER DEFENDANTS**

25.     Brunner is a natural person. Upon information and belief, he resides in Missouri.

---

[2] Based on the 78 portfolio company investments for which Berkshire Firm identifies start and end dates on its website, the median amount of time between a Berkshire Firm investment vehicle acquiring its stake and exiting its stake was 5 years. In more than half of the 78 reported investments, the Berkshire Firm vehicle held its stake for between 3 and 7 years, and in 85% of all cases the Berkshire Firm vehicle held its stake for less than 10 years.

Brunner's grandfather founded Vi-Jon. Prior to 2006, Brunner was the controlling shareholder of Vi-Jon and a member of its Board of Directors.

26.     In 2006, Brunner sold a majority stake in Vi-Jon to Berkshire and retained a minority stake and his Board seat. Brunner held his minority stake through the Brunner Trust. Brunner is the settlor of the Brunner Trust and, upon information and belief, a trustee and beneficiary of the Brunner Trust.

27.     In 2020, Brunner still held his Vi-Jon stake through the Brunner Trust and his Board seat. Through the ESOP Transaction, Brunner liquidated the Brunner Trust's Vi-Jon stake. Upon information and belief, through financing and refinancing agreements made part of the ESOP Transaction, the Brunner Trust received cash and/or notes for its interest in Vi-Jon.

28.     In connection with the ESOP Transaction, the Brunner Trust was a "party in interest" to the Plan within the meaning of 29 U.S.C. § 1002(14)(H) because the Brunner Trust held, directly or indirectly, 10% or more of the Plan employer's stock.[3]

29.     Brunner was a "party in interest" to the Plan within the meaning of 29 U.S.C. § 1002(14)(H) because he was a director of the Plan's employer.

### JOHN AND JANE DOES 1-20 – UNKNOWN TRANSFEREES

30.     Plaintiff does not currently know the identity of other persons, if any, that knowingly benefited from the unfair sale price through transfers of excess proceeds of the ESOP Transaction. *See Fish*, 109 F. Supp. 3d at 1043 ("[The] defendants [that] can be required to disgorge the proceeds of the [prohibited transaction include] a knowing, gratuitous transferee[.]")

---

[3] On his Personal Financial Disclosure Statement submitted in connection with his candidacy for Missouri governor in 2016, Brunner classified the Brunner Trust's interest in Vi-Jon as a 10% or more stake.

31.     When the identities of those not currently named, if any, are ascertained, Plaintiffs will seek leave to join them under their true names.

GREATBANC

32.     GreatBanc is an Illinois corporation headquartered in Lisle, Illinois. GreatBanc is the surviving independent wing of a banking group that was largely subsumed by Citizens Bank in 2007. GreatBanc generates 90% of its revenue from services to employee benefit plans and promotes ESOP trustee services as its core line of employee benefits service.

33.     The market for ESOP fiduciary services is competitive. Each year, GreatBanc competes for jobs doled out by a small group of firms that regularly advise business owners on company valuation and ESOP formation.

34.     Although technically a stand-in for the employee plan, an ESOP trustee is hired, paid, and may be removed by counterparties bent on closing a deal—and doing so at the highest possible price. An ESOP trustee's need to appease the customer to stay employed and earn repeat business from sell-side advisor firms "make[s] it … difficult for a fiduciary to maintain its independence from its counterparts[.]" *See Brundle v. Wilmington Tr.*, 241 F. Supp. 3d 610, 643 (E.D. Va. 2017), *aff'd*, 919 F.3d 763.

35.     Vi-Jon, through its Board of Directors, appointed GreatBanc as the trustee of the Plan.  As trustee, GreatBanc had sole and exclusive discretion to authorize and negotiate the ESOP Transaction on behalf of the Plan.

36.     On or around August 20, 2020, GreatBanc approved the terms of the ESOP Transaction, including the $398 million sale price and 49-year loan term, on behalf of the Plan.

37.     In connection with the ESOP Transaction, GreatBanc acted as a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it was the Plan's

8

trustee within the meaning of ERISA § 403(a), 29 U.S.C. § 1103(a), and because it exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

38.     As trustee, Defendant GreatBanc was also a named fiduciary of the Plan within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), and under the terms of the written instruments under which the Plan was established and maintained.

## DEFENDANTS' ERISA VIOLATIONS

### THE STATUTE

39.     ERISA prohibits transactions between a Plan and a party in interest, and transactions designed to benefit a party in interest. *See* 29 U.S.C. § 1106(a)(1)(A) & (D). "[P]urchase of employer stock by [a] Plan … [is] indisputably [a] prohibited transaction[] within the meaning of [29 U.S.C. § 1106]." *Allen*, 835 F.3d at 675.

40.     ERISA includes a qualified exception to this prohibition in employer stock cases. If the parties to the transaction can prove that the "the acquisition or sale by a plan of qualifying employer securities ... was for adequate consideration," 29 U.S.C. § 1108(e)(1), the prohibition does not apply. *See also Allen*, 835 F.3d at 675 ("The exceptions … include the acquisition of employer stock if it is for 'adequate consideration.'").

41.     "Adequate consideration" is defined as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." 29 U.S.C. § 1002(18). "Fair market value" is customarily considered to be

the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well informed about the asset and the market for such asset.

*See Proposed Regulation Relating to the Definition of Adequate Consideration*, 53 Fed. Reg. 17637 (May 17, 1988).[4]

42.　　A fiduciary is liable for causing a Plan to enter into a non-exempt prohibited transaction. *See* 29 U.S.C. § 1106(a) ("A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect [prohibited transaction]."); *see also Brundle*, 919 F. 3d at 772.

43.　　Any other person is liable for knowingly participating in and benefiting from a prohibited transaction. *See Harris Tr. and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 244–45 (2000) ["ERISA] authorize[s] a civil action against a nonfiduciary who participates in a transaction prohibited by § [1106](a)(1).").

44.　　The ESOP Transaction was a prohibited transaction and, based on the information available to Plaintiffs at this stage, it is reasonable to infer that Defendants are liable to the Plan.

### ABSENCE OF MARKET INTEREST IN VI-JON AT THE ESOP SALE PRICE

45.　　Unlike most private owners who sell their company via an ESOP transaction, selling companies is the Berkshire Firm's business. In the last 35 years, the Berkshire Firm,

---

[4] Courts and practitioners customarily use this definition for guidance, although the regulation was never enacted. *See Brundle*, 919 F.3d at 770 ("DOL[] has proposed, but never enacted, regulations [defining "adequate consideration."] … [C]ourts look to these regulations for guidance[.]").

through its affiliated investment vehicles, has sold interests in at least 78 companies. Yet, until Vi-Jon, the Berkshire Firm does not appear to have ever sold a company to an ESOP.[5]

46.     Berkshire attempted to sell Vi-Jon in its usual way. In 2014, Berkshire hired two investment banks to shop the company in the marketplace. *See* Lillian Rizzo and Gillian Tan, *Personal-Care Products Maker Vi-Jon Is Up for Sale: Owner Berkshire Partners Could Fetch Up to $400 million*, WALL STREET JOURNAL (Aug. 1, 2014 12:38 p.m. ET), https://www.wsj.com/articles/personal-care-products-maker-vi-jon-is-up-for-sale-1406911097. The target price in early discussions was $400 million. *See id.*

47.     No buyer agreed to pay the price Berkshire wanted, despite the company being shopped around by investment banks.

48.     Although the negotiations were not aired publicly, the challenge to finding a buyer willing to pay Berkshire's price was likely related to the company's high debt load and lack of pricing flexibility in the industry. In 2012, crediting rating agency Moody's downgraded Vi-Jon's credit rating, explaining that "lower profitability has lead to weak cash flow generation, increased leverage and a weaker liquidity profile." *See* MOODY'S INVESTORS SERVICE, *Moody's Downgrades Vi-Jon's CFR to B2* (Apr. 11, 2012), https://www.moodys.com/research/Moodys-Downgrades-Vi-Jons-CFR-to-B2--PR_242910 (hereinafter "*Moody's Downgrades Vi-Jon*"). Berkshire placed $245 million of debt on the company to buy it in 2006, and the company still owed at least $167 million in 2012. *See id.*; *see also* MOODY'S INVESTORS SERVICE, *Moody's Assigns First-Time Ratings to VJCS Acquisition* (July 27, 2006). According to Moody's, the company's debt-to-

---

[5] The companies on the Berkshire Firm's public list of closed investments, see s*upra* at note 2, do not appear in Department of Labor ESOP filings, nor did a search for press releases or other public statements regarding ESOP or "employee-owned" status of such companies yield any results.

income ratio suffered over time as the company's operating costs increased without corresponding price increases. *See Moody's Downgrades Vi-Jon.* Moody's analyst predicted that Vi-Jon's credit and pricing issues would persist: "restoring credit metrics to historic levels will be challenging and may take longer than management anticipates given the highly competitive nature of the private label business and lack of near-term pricing flexibility."[6]

49.     Berkshire and the Brunner Defendants remained focused on selling the company after 2014 to no avail. Berkshire had long passed the end of its typical investment timeline. *See supra* at note 2. Based on reports from management, Plaintiffs Laidig and Lewis understood that Berkshire installed a new CEO from outside the company in March 2019 to improve its sale prospects. The new CEO brought consumer brands mergers and acquisitions experience. By 2020, Vi-Jon was among Berkshire's top five longest-held investments, and still no deal was in place.

CREATING A BUYER

50.     After failing to find a buyer at their desired price in the usual places, Berkshire and the Brunner Defendants turned to a new type of transaction: an ESOP. While Berkshire typically sits at arms-length from buyers in sales mediated through investment banks or public exchanges (IPOs), an ESOP transaction is something short of that. Berkshire and the Brunner Defendants created the buyer (the Plan) on their own terms and chose the agent that would sit on the other side of the table (GreatBanc).

51.     Berkshire and Brunner were able to control the Plan formation and trustee hiring process through their control of the company's Board. As Vi-Jon's majority shareholder, Berkshire elected the Board members, and could replace Board members that frustrated its wishes. It does

---

[6] Moody's did not adjust its ratings of Vi-Jon's debt after the 2012 downgrade and withdrew its ratings of Vi-Jon altogether in 2013.

not appear, however, that such measures were necessary. The nine-member Board already consisted of five persons tied to ownership: three active Berkshire Firm members, a professional corporate officer regularly installed by Berkshire as an officer of its portfolio companies, and Brunner. This seller-affiliated majority was able to steer the company toward the ESOP Transaction. Plaintiffs and other Plan participants were not invited to participate in the process.

### OVERRELIANCE ON A TEMPORARY SALES BOOST TO JUSTIFY THE ESOP SALE PRICE

52.     The worldwide spread of COVID-19 slowly entered public consciousness at the end of 2019 and start of 2020. In January 2020, Vi-Jon ramped up hand sanitizer production to meet and anticipate the growing demand for hygiene products to slow the spread of the disease. In March 2020, transmission and public awareness of the disease escalated dramatically. By March 23, 2020, the U.S. Food and Drug Administration issued several policies designed to address shortages of hand sanitizer. *See Policy for Temporary Compounding of Certain Alcohol-Based Hand Sanitizer Products During the Public Health Emergency*, 85 Fed. Reg. 16370 (Mar. 23, 2020) ("[C]onsumers and healthcare professionals are currently experiencing difficulties accessing alcohol-based hand sanitizers.").

53.     As a maker of hand sanitizer, Vi-Jon did well as the COVID-19 pandemic escalated and demand for hand sanitizer peaked in the first half of 2020. *See* U.S. INT'L TRADE COMM'N, *COVID-19 Related Goods: The U.S. Industry, Market, Trade, and Supply Chain Challenges*, 194-201 (Dec. 2020), https://www.usitc.gov/publications/332/pub5145.pdf (analyzing trajectory and peak of COVID-related demand for hand sanitizer and other goods) (hereinafter "*COVID-19 Related Goods*").

54.     However, Vi-Jon's surge in profits was temporary. Plaintiffs Laidig and Lewis, as longtime workers in Vi-Jon's factories, recall that past public health emergencies brought periods

of increased demand for the company's hygiene products followed by production slowdowns as conditions changed. The company's books should have shown the same rises and falls and cautioned that increased demand during public health emergencies is part of the business, not a paradigm shift. Further, by June 2020, many new competitors had entered an already competitive space, threatening Vi-Jon's market share and its ability to sustain increased profits over the long-term through higher prices. *See COVID-19 Related Goods*, at 197-98; *supra* at ¶ 47. By July 2020, scientific studies began to emerge that deemphasized surface contact as a COVID-19 transmission vehicle. *See, e.g.*, Emanuel Goldman, *Exaggerated risk of transmission of COVID-19 by fomites*, THE LANCET (July 3, 2020), https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(20)30561-2/fulltext. These studies were widely reported at the time and altered prevailing assumptions, which should reasonably have been expected to lower demand for hand sanitizer compared to the early months of the pandemic. *See, e.g.*, Derek Thompson, *Hygiene Theater Is a Waste of Time*, THE ATLANTIC (July 27, 2020), https://www.theatlantic.com/ideas/archive/2020/07/scourge-hygiene-theater/614599.[7] By certain indicators, the hand sanitizer market started to decline the next month, just as Defendants were finalizing the ESOP Transaction. *See COVID-19 Related Goods*, at 198-99 (finding that imports of hand sanitizer started to decline in August 2020).[8]

55.     In short, there were a number of reasons to discount early pandemic profits when Defendants valued the company on August 20, 2020. This appears to be corroborated by the fact

---

[7] *See also* Linsey C. Marr, *Yes, the Coronavirus Is in the Air*, NEW YORK TIMES (July 30, 2020), https://www.nytimes.com/2020/07/30/opinion/coronavirus-aerosols.html.
[8] The fall after August 2020 was significant.  Imports fell more than 75% by October 2020 from their July 2020 peak, and overall demand "dropped considerably" by December 2020. *See id.*

that no open market buyer materialized to buy Vi-Jon at Berkshire's preferred price in response to the boom market conditions of the early months of the pandemic.

56.     Berkshire and the Brunner Defendants, however, were able to push the deal through with their hand-picked trustee, GreatBanc. The price to be paid by the Plan to acquire Vi-Jon was determined between Defendants and their advisors. The company assisted by preparing financial projections. The $398 million price that Defendants settled on was 99.5% of the $400 million that Berkshire had previously failed to obtain from arms-length buyers.[9] *See supra* at ¶¶ 45-46.

57.     Upon information and belief, Defendants failed to appropriately discount pandemic-driven sales figures in their valuation process. Instead, it appears that Defendants latched onto pandemic-driven sales figures to attempt to justify Berkshire's asking price, notwithstanding the temporary nature of the underlying market conditions. In a meeting with Vi-Jon's management in 2021, management informed a group of employees that included Plaintiff Lewis that 2020 profits were the company's "new baseline" for financial performance, including in its arrangements with creditors. This statement implies that the company created, and Defendants relied upon, financial forecasts that failed to appropriately discount temporary market conditions in the first half of 2020 in the process of negotiating the purchase price and arranging

---

[9] Berkshire's obstinance is partly explained, but not excused, by the compensation structure and incentives in place for Berkshire Firm, Berkshire GP, and their individual managers. Private equity firms are generally paid 20% of the profits associated with the sale of portfolio companies—their primary form of compensation. *See* CONGRESSIONAL RESEARCH SERVICE, *Taxation of Carried Interest*, at 3 (July 9, 2020), https://crsreports.congress.gov/product/pdf/R/R46447. But these fees generally only accrue if the profits exceed some threshold, known as a hurdle. *Id.* Indeed, Berkshire Firm has disclosed that its managers and general partner entities receive a share of profits earned for all investors if those profits exceed a hurdle rate. *See* Lisa Ward, THE DEAL PIPELINE (Sept. 3, 2012), https://berkshirepartners.com/wp-content/uploads/2020/11/invested_final_locked.pdf. Thus, the potential receipt of millions of dollars in compensation by Berkshire's managers in connection with the sale of Vi-Jon was likely dependent upon selling Vi-Jon for a high-enough price to exceed Berkshire GP's compensation hurdle.

financing for the ESOP Transaction. Defendants' unreasonably optimistic forecasts resulted in an inflated sale price in excess of the fair market value of the company.

### DEFENDANTS' KNOWLEDGE OF THE PROHIBITED TRANSACTION

58.     Defendants knew that the transaction was prohibited by ERISA. GreatBanc is a professional ESOP trustee and aware of ERISA's proscription against party-in-interest transactions involving employer stock.[10] While the underlying stock purchase agreement and valuation documents are not available to Plaintiffs, it is customary for such documents to acknowledge that the ESOP transaction is a prohibited transaction, before reciting the claimed "adequate consideration" exception. Each Defendant likely reviewed and affirmed documents containing similar acknowledgements in this case.

59.     It also reasonable to infer that Berkshire and the Brunner Defendants knew that the sale price exceeded fair market value. Berkshire, through Berkshire GP and its individual managers that also manage Berkshire Firm, is in the business of valuing private companies. Earning attractive returns for its members and investors depends on Berkshire's ability to create favorable financial metrics in its portfolio companies and then find buyers that will place a high value on those metrics. Despite its efforts here, Berkshire failed to find a Vi-Jon buyer using its typical means. Berkshire thus knew that the market's appraisal of the underlying financial metrics did not support its asking price, yet proceeded to extract that price from the ESOP anyway.

---

[10] GreatBanc typically attempts to shift its fiduciary risk back to the sellers or the sponsor company to the maximum extent possible without violating ERISA's anti-exculpatory provision. *See* 29 U.S.C. § 1110(a)). The precise location of that line is the subject of recurring dispute. *See, e.g.*, *McMaken v. GreatBanc Tr. Co.*, 2019 WL 1468157, at *5 (N.D. Ill. Apr. 3, 2019); *Hurtado v. Rainbow Disposal Co., Inc.*, 2018 WL 3372752, at *16 (C.D. Cal. July 9, 2018); *Harris v. GreatBanc Tr. Co.*, 2013 WL 1136558 (C.D. Cal. Mar. 15, 2013).

60.     Berkshire also was in position to control the ESOP valuation process and select the financial metrics that would be considered. Berkshire Firm had three active members on the company's Board, plus a longtime agent that previously served as Vi-Jon's CEO and as the CEO of other Berkshire portfolio companies. Berkshire also installed a new CEO for the purpose of steering the company toward a sale. Berkshire could, and upon information and belief did, create or approve financial forecasts that failed to reasonably discount temporary market conditions.

61.     The Brunner Defendants also had knowledge of failed sales attempts and the ESOP valuation process. Any proposed sale of the company necessarily implicated the Brunner Trust's minority stake. The Brunner Trust, through its agent Brunner, was informed of failed attempts to the sell the company. Brunner also maintained a relationship with Berkshire Firm outside of Vi-Jon and invested Brunner Trust funds in other Berkshire investment vehicles. Brunner also served continuously on Vi-Jon's Board. As a Board member, Brunner had additional knowledge of failed sales attempts, received regular financial reports regarding the company, participated in the creation and administration of the ESOP, and was in position to create or approve financial forecasts used in connection with the ESOP valuation process.

### HARM TO PLAINTIFFS AND THE CLASS

62.     In leveraged deals like the ESOP Transaction, if the "purchase price [i]s inflated and the debt load [i]s unsustainable", the "losers" are the "employee participants in the new … ESOP." *Chesemore v. Fenkell*, 829 F.3d 803, 807 (7th Cir. 2016).

63.     Even if Vi-Jon could have fortuitously met Defendants' overly optimistic performance expectations after the ESOP Transaction, participants would be harmed by the inflated sale price. It takes more capital just to pay off the financing required to obtain the shares, limiting the funds that can be used to make the company (and thus, participants' shares) more

17

valuable. It also takes longer to pay off the debt, which means that fewer shares are released to participants each year. Under the current term, Plan participants will not fully own the company until well after its youngest employees pass retirement age.

64.     The company, however, has struggled to meet Defendants' unreasonable expectations, further endangering participants' interests. In a late 2021 meeting with management attended by Plaintiff Lewis, management informed employees that the company was short of its 2021 performance expectations under key financial metrics. A shortfall would allow the company's lenders to raise its interest rates—protecting the lenders' investment at the expense of the equity holders, the Plan and its participants.

65.     Other recent events have caused Plaintiffs concern. In 2022, management informed employees, including Plaintiffs Laidig and Lewis, that the company is selling significant assets including real estate and equipment and leasing them back from the buyers. Management has given Plaintiffs the impression that such transactions are aimed at appeasing lenders after the company fell behind financial performance expectations in 2021. Plaintiffs are concerned that the company is already on defense due to the excessive sale price and debt load and is being forced to make decisions that will detract from the long-term viability of the company and value of their shares.

66.     Plaintiffs are further discouraged by what they see around the factory. An entire 750,000 square foot warehouse has been full of inventory at times, and the company has paused production multiple times due to the excess supply.[11] Worker turnover is also high, as the company

---

[11] This is consistent with media reporting on retail supply of hand sanitizer after demand subsided. *See* Jaewon Kang, *Retailers Couldn't Stock Hand Sanitizer Fast Enough. Now They Can't Give It Away*, WALL STREET JOURNAL (May 20, 2021 11:00 a.m. ET), https://www.wsj.com/articles/america-is-awash-in-hand-sanitizer-11621522829; Petula Dvorak, *Last year, hand sanitizer was a precious commodity. Now, they're giving it away*, WASHINGTON POST (June 24, 2021 2:02 p.m. ET), https://www.washingtonpost.com/local/last-year-hand-

appears to have little flexibility to increase employee compensation in a tight labor market. The ESOP participants now bear the risk that the company will not sustain sufficient value to provide the retirement benefits that the Plan was supposed to create.

## PLAN-WIDE RELIEF

67.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the Plan pursuant to this statutory provision.

68.     Plaintiffs seek recovery for injuries to the Plan sustained as a result of the prohibited transactions during the statutory period and seek equitable relief on behalf of the Plan as a whole.

69.     Plaintiffs are adequate to bring this derivative action on behalf of the Plan, and their interests are aligned with the Plan's participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation, and intend to pursue this action vigorously on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

70.     Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

71.     Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All participants and beneficiaries of the Vi-Jon Employee Stock Ownership Plan at any time since its inception, excluding Defendants, any fiduciary of the Plan, the

---

sanitizer-was-a-precious-commodity-now-theyre-giving-it-away/2021/06/24/351f1278-d504-11eb-9f29-e9e6c9e843c6_story.html.

directors of Vi-Jon or of any entity in which a Defendant has a controlling interest, and legal representatives, successors, and assigns of any such excluded person.

72.     <u>Numerosity:</u> The Class is so numerous that joinder of all Class members is impracticable.  The Plan had over 1,000 participants as of the end of 2020.

73.     <u>Typicality:</u>     Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' improper actions affected all Plan participants similarly.

74.     <u>Adequacy:</u>     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

75.     <u>Commonality:</u> Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

   a.  Whether GreatBanc is a fiduciary with respect to the Plan;

   b.  Whether the ESOP Transaction satisfied the "adequate consideration" exemption in all respects;

   c.  Whether Berkshire and the Brunner Defendants, and other potential parties (Does), are liable as transferees of proceeds of the ESOP Transaction;

   d.  The proper form of equitable and injunctive relief; and

   e.  The proper measure of monetary relief.

76.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

77.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of GreatBanc as a fiduciary, rescission or amendment of the ESOP Transaction, or appointment of an independent fiduciary would be dispositive of non-party participants' interests. The accounting and restoration of property to the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

78.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial

efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

79.     Plaintiffs and their undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

**COUNT I**
**Causing Prohibited Transactions**
**29 U.S.C. § 1106(a)**
**Against GreatBanc**

80.     Plaintiffs incorporate by reference the foregoing paragraphs as though fully stated herein.

81.     The ESOP Transaction constituted a prohibited transaction in violation of 29 U.S.C. § 1106(a)(1)(A) because GreatBanc, a Plan fiduciary, caused the Plan to engage in a direct or indirect sale or exchange of any property with parties in interest, Berkshire and the Brunner Defendants. In the alternative, the ESOP Transaction constituted a prohibited transaction in violation of 29 U.S.C. § 1106(a)(1)(A) because GreatBanc, a Plan fiduciary, caused the Plan to engage in a direct or indirect sale or exchange of any property with a party in interest, Vi-Jon. In the alternative, the ESOP Transaction violated 29 U.S.C. § 1106(a)(1)(D) because GreatBanc, a Plan fiduciary, caused the Plan to engage in a transaction that constituted the direct or indirect use of assets of the Plan for the benefit of parties in interest, Berkshire and the Brunner Defendants.

82.     The ESOP Transaction also constituted a prohibited transaction in violation of 29 U.S.C. § 1106(a)(1)(B) because GreatBanc, a Plan fiduciary, caused the Plan to enter into a credit transaction with a party in interest, Vi-Jon.

83.     Although Plaintiffs are not required to plead facts to negate Defendants' anticipated "adequate consideration" defense, see *Allen*, 835 F.3d at 676 ("We now hold squarely that …

exemptions are affirmative defenses for pleading purposes, and so the plaintiff has no duty to negate any or all of them."), the circumstances around the ESOP Transaction show that the sale price was excessive and is causing ongoing harm to the company, the Plan, and Plan participants. The Plan and the company must bear the excessive price through nearly 50 years of debt. The excessive price and resulting debt adversely affect the value of participants' retirement benefits.

84.     ERISA, 29 U.S.C. § 1109(a), provides that any person that is a fiduciary with respect to a plan and that breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

85.     ERISA Section 1132(a) permits a plan participant to bring a suit for relief under Section 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA.

86.     GreatBanc caused losses to the Plan resulting from the above-mentioned prohibited transactions, and is liable to the Plan for those losses in addition to appropriate equitable relief to be determined by the Court.

### COUNT II
**Prohibited Transaction Transferee Liability**
**29 U.S.C. § 1132(a)(3)**
**Against Berkshire and the Brunner Defendants**

87.     Plaintiffs incorporate by reference the foregoing paragraphs as though fully stated herein.

88.     Pursuant to 29 U.S.C. § 1132(a)(3), a participant may seek "appropriate equitable relief [] to redress [ERISA] violations[.]" The Supreme Court and courts in this district have held that such "appropriate equitable relief" includes recovering proceeds of a prohibited transaction

from a knowing participant in the transaction. *See Harris Trust*, 530 U.S. 238; *Fish*, 109 F. Supp. 3d at 1043.

89.    Berkshire and the Brunner Trust, and Brunner indirectly through his interest in the Brunner Trust, knowingly benefited from the ESOP Transaction by receiving cash or notes in exchange for their equity in Vi-Jon. Berkshire and the Brunner Defendants knew that their receipt of such consideration was caused by, and conditioned upon, the Plan buying Vi-Jon for $398 million—a prohibited transaction. *See supra* at ¶¶ 55, 57-60, 79-85. Berkshire and the Brunner Defendants orchestrated the ESOP Transaction for their own benefit after failing to sell Vi-Jon for the same price in the marketplace. Pursuant to principles of equity, as adopted and applied by federal courts in ERISA cases, Berkshire and the Brunner Defendants are liable to the Plan for undue proceeds of the ESOP Transaction.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

A.    Certify Plaintiffs' authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

B.    Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiffs as class representatives, and their counsel as class counsel;

C.    Declare that GreatBanc caused the Plan to engage in prohibited transactions in violation of 29 U.S.C. § 1106(a)(1)(A), (B), & (D);

D.    Declare that such prohibited transactions did not satisfy all requirements for exemption under ERISA;

E.    Declare Berkshire and the Brunner Defendants knowingly participated in such prohibited transactions in violation of ERISA;

F.    Remove GreatBanc as trustee of the Plan, to be replaced by an independent fiduciary;

G.      Order GreatBanc to make good to the Plan, and/or any successor trust(s), losses resulting from violations of ERISA;

H.      Impose a constructive trust on all payments received by the Berkshire and the Brunner Defendants as a result of the ESOP Transaction, and order Berkshire and the Brunner Defendants to account for such payments to the Plan;

I.      Order that Defendants provide other appropriate equitable relief to the Plan and its participants and beneficiaries;

J.      Approve a fair and equitable plan of allocation of any proceeds recovered on behalf of the Plan such that the Plan and its participants will be made whole;

K.      In the alternative to Paragraphs G-J, order rescission of the ESOP Transaction;

L.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

M.      Award prejudgment and post-judgment interest; and

N.      Award such other and further relief as the Court deems just and equitable.

Dated: December 7, 2023

**BAILEY & GLASSER LLP**

*/s/ Patrick O. Muench*
Patrick O. Muench (IL Bar No. 6290298)
318 W. Adams St., Suite 1512
Chicago, IL 60606
Tel: 313-500-8680
pmuench@baileyglasser.com

Gregory Y. Porter (pro hac vice)
Ryan T. Jenny
1055 Thoms Jefferson, NW, Suite 540
Washington, DC 20007
Tel: 202-463-2101
gporter@baileyglasser.com
rjenny@baileyglasser.com

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN Bar No. 22084X*
     *Admitted in N.D. Ill.*
Brock J. Specht, MN Bar No. 0388343**
Brandon T. McDonough, MN Bar No. 0393259**
Jacob T. Schutz, MN Bar No. 0395648**
     ** *pro hac vice applications forthcoming*
4700 IDS Center

25

80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
bpsecht@nka.com
bmcdonough@nka.com
jschutz@nka.com

ATTORNEYS FOR PLAINTIFFS